UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Joan Scheske,

    Plaintiff,

v.

University of Michigan Health System,

    Defendant.

                                      /

Case No. 13-13345

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This Title VII retaliation case arises out of Plaintiff Joan Scheske's employment at Defendant University of Michigan Health System. Plaintiff argues that she was terminated in retaliation for raising gender discrimination concerns in a presentation to a supervisor. Defendant argues that Plaintiff's presentation was not a protected activity under Title VII. For the reasons stated below, this Court GRANTS Defendant's motion for summary judgement and DISMISSES Plaintiff's complaint with prejudice.

**I.**    **Facts**

    **A. Plaintiff's Employment Prior to August 29, 2012**

Plaintiff was originally hired in January 2008 as a Senior Financial/Business Analyst in the University of Michigan Medical School's Department of Finance. She worked in that role until October 2009, when she was promoted to Senior Financial Manager. (Pl.'s Resp., Ex. 3.) Following a restructuring that combined the University of Michigan Medical School's finance department with the University of Michigan Hospital's finance department, Plaintiff

sought employment in the Department of Surgery, chaired by Dr. Michael Mulholland. (*Id.*, Ex. 6 at 26.)

Plaintiff accepted the new position in April 2010 following a formal offer from David Mohr, Chief Administrator of the Department of Surgery. (Def.'s Mot., Ex. G at 2-3.) Her working title was Director of Strategy and Business Development, and her market title was Market Research Analyst Lead. (Pl.'s Resp., Ex. 4.)[1] In this role, Plaintiff's direct supervisor was David Mohr. She also had weekly meetings with Dr. Mulholland to review her assignments and work. (*Id.*, Ex. 6 at 41.)

Although Plaintiff had the working title of a director, her market title was only that of an analyst. She believed that her market title was not reflective of her actual responsibilities and that her salary was therefore too low. (*Id.* at 54.) She alleges that she researched the market titles of both male and female hires in the Department of Surgery and determined that women were being given lesser market titles than men. (Pl.'s Resp., Ex. 6 at 54.) She also claims that she had multiple meetings with David Mohr where she discussed how she thought that she did not have an appropriate market title for her responsibilities. (*Id.*) She did not use the term "gender discrimination" in these discussions, but she claims that she did describe "the definition of it" to him. (*Id.*)

On August 21, 2012, Plaintiff met with Dr. Mulholland for one of their weekly meetings. At this meeting, they discussed Plaintiff's market title and her concerns with it.

---

[1] At the University of Michigan, a person's working title is the title that is presented to the public (*e.g.,* on business cards, in an email signature, or on the department's website). (Pl.'s Resp., Ex. 7 at 17.) The market title is only used internally to determine pay scale and possible levels of progression. (*Id.* at 16.) Working titles are used because market titles can be generic and not as well understood by the public. (*Id.* at 17.)

2

Dr. Mulholland informed Plaintiff that the Human Resources Department reviewed her market title in February 2011 and deemed it appropriate. The discussion then turned to David Mohr. Plaintiff and Defendant have different recollections of this discussion. Defendant claims that Plaintiff described David Mohr as "ill-intended, illogical, ill-informed and incompetent." (Def.'s Mot., Ex. J at 2.) Plaintiff admits that she criticized David Mohr, but only described him as being "disingenuous." (Pl.'s Resp., Ex. 6 at 116.) Plaintiff also claims that she "factually described what [she] believed to be gender discrimination and pay equity" at that time.[2] (*Id.*) Defendant claims that Dr. Mulholland then informed Plaintiff that her criticism of David Mohr was unjustified and that she would have to adjust her behavior if she wished to continue working in the Department of Surgery. (Def.'s Mot., Ex. J at 2.)

The next day, Plaintiff had a performance review with David Mohr. In the review, David Mohr gave Plaintiff a rating of "exemplary" in every category. (Pl.'s Resp., Ex. 9.) He wrote that Plaintiff "has performed at an exemplary level," that she "has developed key relationships, throughout the University and beyond," and that "the department is fortunate to have [her]." (*Id.* at 6.) He also gave Plaintiff high ratings for the categories "easy to approach and talk to," "listens well," and "builds rapport; interacts with staff members in a manner that is engaging and non-threatening." (*Id.* at 8.) He later testified that he did not believe that Plaintiff had intercommunication problems with anyone in the department at that time. (Pl.'s Resp., Ex. 10 at 17.)

### B. Plaintiff's August 29th Meeting With Dr. Mulholland

---

[2] Plaintiff later claimed in her deposition that she never discussed gender discrimination with Dr. Mulholland prior to their meeting on August 29, 2012. (Pl.'s Resp., Ex. 6 at 178.)

Plaintiff met with Dr. Mulholland again on August 29th. At this meeting, Dr. Mulholland informed Plaintiff that he had considered her concerns, but that her market title was not going to be changed to director. Plaintiff again objected to this and wished to make a presentation to Dr. Mulholland to express her viewpoint. (Pl.'s Resp., Ex. 6 at 183; Ex. 12 at 2-3.) Plaintiff testified that she prepared the presentation to "express concern about gender discrimination and pay inequity." (*Id.,* Ex. 6 at 58.) The topics that she planned on covering were "role specifics, titling, issue history and role definition . . . titling prior to joining the department and the rationale that was provided for under titling." (*Id.* at 183.) Dr. Mulholland agreed to let Plaintiff make the presentation as long as it did not discuss David Mohr and his prior decisions. (Pl.'s Resp., Ex. 6 at 180.)

The title of the presentation is "Staffing." (Pl.'s Resp., Ex. 11 at 1.) It has a total of 26 slides. The presentation first discusses the history of her "titling issue" and her transition to the Department of Surgery. (*Id.* at 3-4.) The presentation then describes the rationales given to her by David Mohr for not giving her a market title of director. The slides repeatedly refer to the rationales as being "disingenuous," "irrational," and "illogical." (*Id.* at 3, 5, 7-13, 20, 25.)

The presentation also compares Plaintiff's situation with that of others in the department, both men and women. Slide 10, under the bullet point titled "Inconsistent Treatment," discusses how two men, Charles Ridenour and David Mohr, both joined the Department of Surgery and obtained the market title of director. Slide 11 discusses David Mohr and Charles Ridenour again. It also states that another male employee, Todd Bridges, received a market title change to a management level position upon joining the

4

department, while a female employee, Tanya Koltayr, had her market title changed from a management to a staff role upon entering the department. Slide 12 addresses the rationale that Plaintiff cannot have the market title of director because she reports to David Mohr and there are no directors who report to other directors. To counter this, the slide describes both men and women who report to David Mohr but have nonetheless been given the market title of director.

Aside from those three slides, there are no other comparisons made to other employees, male or female. The presentation never uses the words "discrimination," "gender," or "sex," and it never states that the department treats men differently than women. No reference is ever made to Plaintiff's gender or any of the employees' genders. The presentation also never states that Plaintiff nor any other employee has ever been denied the market title of director nor has experienced any discriminatory treatment because they are women.

The remainder of the slides further describe the history of why Plaintiff has been denied the market title of director, her reasons for why this denial has been incorrect, and the limitations of not being a director. There is no mention of gender in these slides. Slide 16 is titled "Intentional Prevention of Advancement," but it makes no reference to gender. Plaintiff testified that during the presentation, Dr. Mulholland did not make any comments except on the slide comparing the definition of director and analyst in the University of Michigan. (Pl.'s Resp., Ex. 6 at 188; Ex. 11 at 14.) At that point, they discussed why Dr. Mulholland believed Plaintiff did not meet the qualifications for having the market title of director. (Pl.'s Resp., Ex. 6 at 188-89.)

Plaintiff testified that at the end of the presentation, Dr. Mulholland said, "we're done," went over to his desk, and did not say anything else to Plaintiff. (*Id.* at 196.) In an email sent on September 4th, however, Plaintiff indicated that Dr. Mulholland suggested that she should resign from her position if she could not work within the structure of the department. (*Id.*, Ex. 12, at 1-2.)

### C. Plaintiff's Termination

The day following Plaintiff's presentation, August 30, 2012, Dr. Mulholland informed Stephanie Schroeder, Director of Human Resources for the Department of Surgery, that Plaintiff could no longer work in the department. (Pl.'s Resp., Ex. 16 at 10-11; Ex. 7 at 27.)[3] At that time, Dr. Mulholland did not intend to terminate Plaintiff from the University entirely. He testified that he told Stephanie Schroeder to "help [Plaintiff] find a new position potentially within the University of Michigan and to offer [her] up to six months salary as a way of helping her over to that transition." (Pl.'s Resp., Ex. 16 at 27.) Stephanie Schroeder also testified that she understood that Dr. Mulholland wanted Stephanie to create a strategy for removing Plaintiff from the department, but that Plaintiff could still remain at the University. (*Id.*, Ex. 7 at 27.) At the time, there were no positions known to be available for Plaintiff to be placed into, and no proposal was made to Plaintiff regarding her termination. (*Id.*, Ex. 16 at 27-28.)

---

[3] According to David Mohr, Dr. Mulholland had discussed with him the possibility that Plaintiff might not be able to continue working in the department because of her actions prior to her August 29th presentation. (Pl.'s Resp., Ex. 10 at 30-31.) However, the decision was not solidified until after the presentation. (*Id.* at 31.) David Mohr also testified that the decision to separate Plaintiff from the department was made mutually between himself and Dr. Mulholland. (*Id.*)

6

Although Plaintiff thought that she might be terminated following her presentation, she did not know that she was being removed from the department until September 4th. On that day, Dr. Mulholland sent Plaintiff an email informing her that "it would be best for you to seek further employment outside of the Department of Surgery" and referred her to Stephanie Schroeder to work out an exit plan. (Pl.'s Resp., Ex. 12 at 2.) Plaintiff responded to Dr. Mulholland's email expressing her displeasure in the decisions regarding her market title. (*Id.* at 1-2.) She also refers to instances of "discriminatory behavior" against her, but does not make any reference to gender or sex. (*Id.* at 1.)

After a series of emails, Stephanie Schroeder and Plaintiff scheduled an exit strategy meeting to take place at 1:00 PM on September 5th. Before that meeting took place, however, Plaintiff contacted the University's OIE to file a complaint of gender discrimination, sexual harassment, and retaliation in violation of the University of Michigan's non-discrimination policy. The OIE then investigated Plaintiff's claims and told the Department of Surgery not to take any action against Plaintiff during the investigation.

The investigation ended on November 7th. The OIE concluded that Plaintiff could not establish any of her claims. (Def.'s Mot. Ex. N; Ex. O.) Directly following the end of the investigation, David Mohr emailed Plaintiff to inform her to attend a Disciplinary Review Conference (DRC)[4] regarding her employment the next day. (*Id.*, Ex. G at 3.) At the meeting, Defendant offered Plaintiff a settlement offer of four months severance pay, a

---

[4] A DRC is "a meeting to provide an opportunity for discussion with an employee whose termination at the initiative of the University is contemplated. The conference will include an oral or written statement of the alleged misconduct or performance concerns and allow an opportunity for the employee to respond. The employee will be informed of the outcome in a timely fashion." University of Michigan Standard Practice Guide § 201.12: Discipline, http://spg.umich.edu/policy/201.12.

7

reference letter, and the ability to be re-hired at the University of Michigan (except for the Department of Surgery). (Pl.'s Resp., Ex. 7 at 28-31; Ex. 10 at 26-27.) This was a "take-it-or-leave-it" offer. If the plaintiff did not accept it, she would be terminated with no pay and no chance of re-hire at the University. (Pl.'s Resp., Ex. 7 at 30.) Although she was given 21 days to consider the offer, (*Id.*), Plaintiff refused it that day. (*Id.*, Ex. 10 at 27.) David Mohr sent Plaintiff a termination letter on November 8th, and she was terminated effective November 29th. (*Id.*, Ex. 15.) In Plaintiff's termination letter, David Mohr stated that Plaintiff "indicated that [she was] unwilling to work within the established structure" of the department, and that the reason for her termination was her "inability to work with me in a collaborative manner" and that her disagreements concerning her market title were "expressed in such an unreasonable manner that [she] undermined the possibility of maintaining a collegial and productive working relationship in the future." (*Id.*)

### D. Procedural History

Plaintiff filed a complaint with the EEOC on November 27, 2012 alleging discrimination based on sex, retaliation, and violation of the Equal Pay Act. (Def.'s Mot., Ex. Q.) On May 7, 2013, the EEOC issued a Notice of Right to Sue. (*Id.*) Plaintiff filed this action on August 5, 2013, where she alleged three counts: (I) discrimination on the basis of sex; (II) retaliation; and (III) violation of the Equal Pay Act. (*Id.*, Ex. A.) On April 29, 2014, Plaintiff voluntarily dismissed Counts I and III. (*Id.*, Ex. R.)

### II. Summary Judgment Standard

Summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

### III.  Analysis

Title VII prohibits an employer from retaliating against any of its employees for opposing its discriminatory practices. 42 U.S.C. § 2000e-3(a). Plaintiffs alleging retaliation under Title VII can do so with either direct evidence or circumstantial evidence. *Laster v.*

*City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). In this case, Plaintiff seeks to prove her claim using circumstantial evidence of retaliation. These claims are analyzed under the framework of *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 801-805 (1973).

Under *McDonnell Douglass*, Plaintiff must first establish a *prima facie* case of discrimination. In the retaliation context, this requires Plaintiff to show that: (1) she engaged in a protected activity; (2) Defendant knew of her protected activity; (3) Defendant thereafter took an adverse employment action against her; and (4) there is a causal connection between the protected activity and the adverse employment action. *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009).

If Plaintiff succeeds in establishing her prima facie case, a presumption of unlawful retaliation arises, and the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for its action. *Id.* If Defendant is able to produce such a reason, the burden shifts back to Plaintiff to show that Defendant's reason was not the true reason for the adverse action and was merely pretexual. *Id.* Despite the shifting burdens of the *McDonnell Douglass* framework, Plaintiff always bears the ultimate burden of persuasion. *Laster*, 746 F.3d at 731.

### A. Plaintiff's Presentation Is Not a Protected Activity

Plaintiff argues that she engaged in a protected activity when she made her presentation to Dr. Mulholland on August 29th. There are two types of protected activity under Title VII. First, under the "opposition clause," employers cannot retaliate when an employee has "opposed any practice made an unlawful employment practice under [Title VII]." 42 U.S.C. § 2000e-3(a). Second, under the "participation clause," employers also cannot retaliate when an employee has "participated in any manner in an investigation,

proceeding, or hearing under [Title VII]." *Id.* For an activity to fall under the participation clause, "the instigation of proceedings leading to the filing of a complaint or charge . . . is a prerequisite." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989). Activities prior to the instigation of statutory proceedings are analyzed under the opposition clause. *Id.*

Because Plaintiff's presentation to Dr. Mulholland occurred before she filed her complaint with the EEOC, she must show that the presentation was opposition activity. "Oppose" is not defined in Title VII. It therefore takes its ordinary meaning: "to resist or antagonize . . .; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)). This includes "complain[ts] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570-71 (6th Cir. 2009)(quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)).

Despite this broad definition, Title VII does not protect all "opposition" activity. *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986). For the activity to be protected, a plaintiff must put her employer on notice that she is opposing a practice made unlawful by Title VII. *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013)(citing *Booker*, 879 F.2d at 1313). That is, the plaintiff must make it clear that she is opposing discrimination against a protected class. *Id.* at 374; *Speck v. City of Memphis*, 370 F. App'x 622, 626 (6th Cir. 2010). "An employee may not invoke the protections of the Act (Title VII) by making a vague charge of discrimination." *Brown*, 545 F. App'x at 373 (quoting *Booker*, 879 F.2d at 1313). Accordingly, complaints about management practices or decisions

11

rather than discrimination against a protected class are not protected activities under Title VII. *Booker*, 879 F.2d at 1313; *see also Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 44-45 (6th Cir. 2009); *Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 531 (6th Cir. 2004) (per curium).

Plaintiff's presentation to Dr. Mulholland is not a protected activity because it did not put Defendant on notice that Plaintiff was opposing a discriminatory practice. The presentation is essentially a complaint about the decision not to give Plaintiff the market title she preferred. That is not a protected opposition activity. *See Willoughby*, 104 F. App'x at 531 ("The district court properly granted summary judgment because the letter was contesting the correctness of a decision made by his employer rather than asserting discrimination.") (internal quotations omitted). The presentation never mentions the term "discrimination" and it also does not state that Defendant treats women in a discriminatory manner. Gender is never explicitly mentioned during the course of the presentation. *See Brown*, 545 F. App'x at 374 (holding that an employee's complaint regarding her higher paid subordinates was not protected conduct in part because "the racial identification of [the employee's] subordinates does not appear in the emails and neither does the word 'discrimination.'"). Although Plaintiff was not required to use legal jargon in her presentation to gain the protection of Title VII, *see Minevich v. Spectrum Health-Meier Heart Ctr.*, No. 1:12-CV-1358, 2014 WL 869186, at *10 (W.D. Mich. Mar. 6, 2014), she needs to at least present sufficient evidence for a reasonable jury to infer that her presentation opposed gender discrimination, and she has not done so.

Plaintiff did testify in her deposition that although she never used the words "gender" or "discrimination" during the course of her presentation to Dr. Mulholland, she did

12

"describe gender discrimination" to him. (Pl.'s Resp., Ex. 6 at 57.) Viewed in a vacuum, this statement might preclude summary judgment in favor of Defendant. In determining whether there is a genuine issue of material fact, however, this Court must not view the evidence in a vacuum, but look to the record as a whole. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ("Where the record *taken as a whole* could not lead a rationale trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'")(emphasis added); *Wilson v. Cleveland Clinic Foundation*, No. 13-3258, 2014 WL 4397205, at *10 (6th Cir. Sept. 8, 2014)("The dissent's election to close its eyes to the entirety of the record and instead view in isolation [plaintiff's evidence] . . . flies in the face of longstanding and controlling precedent."). Taking the record as a whole, this testimony does not create a genuine issue as to whether Plaintiff's engaged in a protected activity. Plaintiff's presentation demonstrates how Plaintiff described her complaints to Dr. Mulholland. In that presentation there is no reference to gender discrimination that could give notice to Defendant that Plaintiff was opposing gender discrimination rather than a lawful management decision.

Plaintiff's presentation is similar to the employees' letters in *Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528 (6th Cir. 2004) and *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106 (6th Cir. 2001). In *Willoughby*, a white employee claimed that he was retaliated against for opposing race discrimination. The employee wrote a letter to his employer contesting a demotion he received after making an inappropriate and racist joke. 104 F. App'x at 529. The letter contained twelve paragraphs, but in one of those paragraphs he wrote that the incident leading to his demotion "did not start anywhere close to being a racial event" but that it had been escalated to that level. *Id.* at 531. He also wrote that

13

although the employer's workforce was mostly African American, the vast majority of employees who left the workforce were white. *Id.* The court held this letter was "contesting the correctness of a decision made by his employer rather than asserting discrimination," and that it was "insufficient to constitute opposition to an unlawful employment practice." *Id.* (quoting *Booker*, 879 F.3d at 1313).

In *Majewski*, an employee wrote a letter to his corporate office complaining about the conduct of his supervisor. 274 F.3d at 1110. The employee alleged that his supervisor singled him out for mistakes that other employees made without punishment and wrote, "I was not doing anything different than my co-workers and I felt like they were trying to fire me before I was 40." *Id.* The court held that this was not protected conduct opposing age discrimination. The reference to his age was only an "isolated statement" made in the context of a letter that criticized the supervisor for mistreating employees "both over and under the age of 40." *Id.* It did not "transform the letter into a protected complaint concerning age discrimination." *Id.*

Here, any reference to gender in Plaintiff's presentation is similarly only an isolated statement that does not indicate that her presentation is objecting to gender discrimination. The presentation does compare Plaintiff's situation with that of men in the department. (Pl.'s Resp., Ex. 11 at 10-11.) The presentation, however, also compares Plaintiff's situation with that of other women who Plaintiff believes have been treated more favorably than she was. (*Id.* at 12.) The mere mention and comparison of men in the presentation does not make it a protected activity opposing gender discrimination. *See Majewski*, 274 F.3d at 1110; *Willoughby*, F. App'x at 531. Furthermore, the mention of male employees is only a minor part of a much larger discussion of the reasons why Plaintiff believed the decision

to not change her market title was incorrect. The presentation contests the correctness of Defendant's decision to not provide Plaintiff with the market title of director, not any unlawful employment practice. It is therefore not a protected activity under Title VII. *See Booker*, 879 F.2d at 1313.[5]

### B. Even If the Presentation Is a Protected Activity, Plaintiff Cannot Establish Pretext

Even if Plaintiff could establish that her August 29th presentation was a protected activity, she has not presented sufficient evidence that the legitimate, non-discriminatory reasons for the decision to terminate her employment on August 30th were pretextual. Defendant has offered legitimate reasons for terminating Plaintiff. Plaintiff criticized David Mohr multiple times, including in her presentation, and Dr. Mulholland warned her against doing this. (Pl.'s Resp., Ex. 6 at 116, 180; Ex. 11.) David Mohr and Dr. Mulholland also testified that Plaintiff could no longer work within in the structure of the department based on her repeated criticisms and disagreements. (*Id.*, Ex. 10 at 26, 28; Ex. 16 at 20, 28-29.) And in Plaintiff's termination letter, David Mohr stated that the reason for the decision to terminate Plaintiff was her "inability to work with me in a collaborative manner" and that her disagreements concerning her market title were "expressed in such an unreasonable

---

[5] Plaintiff also argues that she was retaliated against for filing a complaint with the OIE. Although this complaint is a protected activity, *Laster*, 746 F.3d at 730, Plaintiff cannot establish a causal connection here because the decision to terminate Plaintiff was made prior to her complaint. *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013)(requiring but-for causation in Title VII retaliation cases). Plaintiff also cannot establish that the final terms of her termination—severance pay and no chance of rehire at the University—were retaliation for the complaint as she was terminated with these terms because she rejected the settlement offer proposed to her at the DRC.

manner that [she] undermined the possibility of maintaining a collegial and productive working relationship in the future." (*Id.*, Ex. 15.)

Because Defendant has met its burden of showing a legitimate, non-discriminatory reason, the burden shifts to the Plaintiff to show that those reasons are actually pretextual and that the real reason is retaliation. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-508 (1993). There are three ways Plaintiff can demonstrate pretext. She can show that Defendant's stated reasons: (1) have no basis in fact; (2) were not the actual reason for the termination; or (3) are insufficient to warrant the challenged conduct. *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 597 (6th Cir. 2007).

Plaintiff presents three pieces of evidence to support her argument. None allow a reasonable jury to find that Defendant's legitimate reasons were pretext. First, Plaintiff offers evidence that Dr. Mulholland testified in his deposition that the ultimate reason for Plaintiff's termination from the University was that she "made a series of false statements that were the basis of the decision that she would no longer be a part of the University of Michigan's employment." (Pl.'s Resp., Ex. 16 at 20.) This statement cannot show that Defendant's reasons for terminating Plaintiff on August 30th were pretext. In that testimony, Dr. Mulholland was referring to Plaintiff's statements made in her complaint to the OIE after August 30th. Plaintiff even characterizes Dr. Mulholland's testimony in this way in her brief. (Pl.'s Resp. at 19.) Plaintiff's complaint to the OIE could not have been a part of Dr. Mulholland's decision making on August 30th.

Second, Plaintiff argues that David Mohr's positive performance review of Plaintiff on August 22nd shows that he was lying when he wrote in the termination letter that she could no longer work with him in a collaborative manner. The performance review is positive and

16

expresses that "the department is fortunate to have [Plaintiff]." (*Id.*, Ex. 9 at 6.) The review, however, was written before the actions that formed the basis of the decision to terminate Plaintiff. Plaintiff criticized David Mohr to Dr. Mulholland only one day before the performance review. Plaintiff has presented no evidence that David Mohr was even aware of her actions at the time the review was written. The review was also written before Plaintiff's August 29th presentation to Dr. Mulholland. Plaintiff cannot establish pretext from a performance review written before the reasons stated for her termination occurred. *See Michael*, 496 F.3d at 597, 599 (holding that a positive performance review occurring prior to the events the employer offered as justification for the alleged adverse action could not establish pretext).

Third, Plaintiff similarly argues that David Mohr was lying in his termination letter because the OIE investigation report states, "[David Mohr] stated that his relationship with [Plaintiff] is odd and strained, and explained that personality differences with [Plaintiff] interfere with their ability to have open and relaxed communication. [David Mohr] added that he and [Plaintiff] have been able to work together." (Pl.'s Resp., Ex. 14 at 8.) Plaintiff characterizes this as David Mohr admitting that even though his relationship with Plaintiff was poor, he could still work with her. Plaintiff argues that if this is true, then he must have been lying in his termination letter. There are two problems with this argument. First, the statement in the OIE report is likely hearsay. *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997) ("The above testimony cannot create a genuine issue of material fact because it is inadmissible hearsay."). Second even if it is not hearsay, a reasonable juror could not infer from this statement that David Mohr believed he still had the ability to work with Plaintiff. The statement indicates that David Mohr, at one point in time, could

work with Plaintiff. It does not provide evidence for the assertion that David Mohr thought he could still work with Plaintiff from that point forward and that he was therefore lying in his termination letter.

Plaintiff has not provided evidence from which a reasonable jury could find that Defendant's proffered legitimate reasons for the decision to terminate Plaintiff on August 30th are actually a pretext for retaliation.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and Plaintiff's complaint DISMISSED with prejudice.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: October 2, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 2, 2014, by electronic and/or ordinary mail

s/Carol J. Bethel
Case Manager